UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| JOHN BUFF, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:06CV00138 ERW |
| ) | |
| CHUCK DWYER, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the Motion for Summary Judgment of Defendants Laura Vance, Yvonne Moore, Dawn T. Horn, Daniel Martinez, MaryAnn Faulkner, Alex J. Clinton, Lance Gordon, Christy Clinton, Kevin McKay, Travis B. Jackson, Donald J. Beck, Erik N. Harper, and Jackie L. Cooper (collectively, "Defendants") [doc. #162].

**I.  BACKGROUND FACTS[1]**

This case arises out of injuries Plaintiff John Buff ("Plaintiff") allegedly sustained in January and March 2005 at the hands of other inmates of the Southeast Correctional Center ("SECC"), a prison facility operated by the State of Missouri and located in Charleston, Missouri.

On January 25, 2005, Plaintiff arrived at the facility, and in connection with his arrival, Plaintiff completed a "Protective Custody Needs Assessment Waiver," stating that he did not have any known enemies in the general population and did not require protective custody. Several days later, however, on January 31, 2005, Plaintiff reported to Defendant Christy Clinton ("C. Clinton"), an SECC corrections officer, that he had been attacked by a number of other inmates, who assaulted him, took his tennis shoes, and threatened to kill him if he returned to the

---

[1] The Court's recitation of the facts is taken from Defendants' Statement of Uncontroverted Material Facts and Plaintiff's responses thereto.

general population. Plaintiff stated that he was unable to specifically identify his assailants because they had covered their faces with red bandannas, but that they were African-American and were wearing Nike tennis shoes and hooded sweatshirts. Following Plaintiff's report, the wing in which Plaintiff's cell was located was "locked down" – the doors were locked to prevent any movement and all inmates were ordered to remain in their cells – and C. Clinton, along with other corrections officers, searched the wing in an attempt to find the responsible parties, but they were unable to locate any inmates with noticeable marks from fighting or who otherwise fit the description Plaintiff had given.

C. Clinton also notified her supervisor, Defendant Erik Harper ("Harper") of Plaintiff's complaint. Harper interviewed Plaintiff concerning the incident, and he declined to give a statement. Plaintiff was subsequently issued a "Rule 25" conduct violation for "fighting – engaging in an unauthorized physical struggle with one or more inmates." As a result of the conduct violation, SECC staff placed Plaintiff in temporary administrative segregation confinement ("TASC") due to "an immediate security risk" and "an urgent need to separate the inmate from other for his own safety or that of others." Before Plaintiff was transferred to TASC, he received medical treatment for abrasions on his head and cuts on his forehead on the inside of his lip.

Several days later, on February 2, 2005, Defendant Dawn Horn ("Horn") conducted a hearing concerning Plaintiff's conduct violation. The report of the hearing consists of a statement from Plaintiff, to the effect that he did not know how he could receive a conduct violation for fighting when he was attacked by unidentified assailants, and a statement from the officer who issued the conduct violation that Plaintiff had reported to him that he had been in an altercation with inmates from D-wing. On that basis, Horn concluded that Plaintiff had in fact been involved in a fight, and found him guilty of the conduct violation[2] and ordered ten days of

---

[2] This conduct violation was later expunged from Plaintiff's record.

disciplinary segregation, followed by a referral to the administrative segregation hearing committee, consisting of Horn, Defendant Dan Martinez ("Martinez"), and another individual who is not a Defendant in this case. The committee met on February 8, 2005 and recommended that Plaintiff be placed in administrative segregation for thirty days, based on "the serious nature" of his offense and "pending protective custody review." Defendant Laura Vance ("Vance"), Associate Superintendent of Offender Management, approved the recommendation.

On February 14, 2005, Plaintiff presented an Informal Resolution Request ("IRR") – a type of informal grievance – to Defendant Jackie Cooper ("Cooper"), a classifications caseworker at the SECC. In investigating the IRR, Cooper observed Plaintiff's wounds, which in her opinion appeared to be superficial and self-inflicted. Cooper also noted that prior to his alleged assault, Plaintiff had repeatedly requested a single cell. The IRR form states that Plaintiff's grievance could not be resolved informally, in that he was requesting to be placed in protective custody.

On March 3, 2005, approximately thirty days after Plaintiff had been placed in administrative segregation, a committee consisting of Horn, Martinez, and Defendant Yvonne Moore ("Moore") held a classification hearing to re-assess Plaintiff's status. The committee recommended that Plaintiff be returned to the general population, noting his improved behavior and that he did not have any known enemies. Plaintiff requested placement in protective custody at the hearing, and this request was denied based on a facility policy that protective custody is unavailable unless an inmate can specifically identify a known enemy. Plaintiff did not otherwise make a statement at the hearing, and Vance approved the committee's recommendation. Plaintiff was released from administrative segregation the following day, and Defendants Alex Clinton ("A. Clinton") and Lance Gordon ("Gordon") escorted him to his cell

in the general population, denying Plaintiff's repeated requests that they transfer him to protective custody instead.[3]

Three days later, in the early morning of March 7, 2005, Plaintiff reported that he had again been assaulted and was found in his cell with superficial lacerations to his left shoulder, left lower abdomen, and right upper chest. This alleged assault occurred around the time that inmates' cells are unlocked as a group, so that they can leave for breakfast. Three fellow inmates state in affidavits that they saw two inmates approach Plaintiff's cell, heard commotion coming from that direction, and then saw the two inmates leaving the scene. None of the three was able to identify either of these inmates, other than to say that they were both African-American, had braids, were wearing "state coats,"[4] and that one was smaller than the other. Following medical treatment, Plaintiff was placed in TASC pending a further investigation into the alleged assault and a review of whether Plaintiff required protective custody. The mental health professional on duty directed that Plaintiff be placed on close observation and noted the possibility that his wounds were self-inflicted, although Plaintiff claimed otherwise.

The remaining Defendants in this action are corrections officers who were on duty in Plaintiff's housing unit on the morning of this second alleged assault. Defendant MaryAnn Faulkner ("Faulkner") was acting as wing officer at the time, and was within the housing unit bubble – an enclosed area within the unit – when the incident occurred. Defendant Donald Beck ("Beck") was the unit bubble officer, and was also in the bubble when officers received Plaintiff's report. Defendant Travis Jackson ("Jackson") was actually within the unit – that is, outside the bubble and among the inmates – as they were waiting to be released for breakfast. Plaintiff's cell was located on the top level of the unit, and after the inmates were released,

---

[3] There is no evidence in the record addressing whether these Defendants actually possessed the authority to do so; it certainly appears, based on the mechanics of the classification committee hearing process – including the need for Vance to approve the committee's recommendations – that they did not.

[4] This apparently refers to an item of prison-issued apparel.

Jackson began securing cells on the bottom level. He did not see any inmates on the top of the walkway go from one cell to another during this time, and he responded to Plaintiff's cell when Plaintiff reported to another corrections officer that he had been injured. Defendant Donald Beck ("Beck") was in the cafeteria area of the facility that morning, and he reported to Plaintiff's cell upon receiving a radio report of the alleged incident.

Based on this second alleged assault, Plaintiff asserts claims against Defendants under 42 U.S.C. § 1983, seeking declaratory and monetary relief for violations of his Eighth Amendment rights. Specifically, Plaintiff contends that in failing to place him in protective custody following the first alleged assault, Defendants were deliberately indifferent to a serious risk to his safety – a risk that later manifested itself in a second assault.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. If the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof on a motion for summary judgment is placed on the moving party to establish "the non-existence of any genuine issue of fact that is material to a judgment in his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th

Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden shifts to the non-moving party to set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(e)(2). When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but, by affidavits and other evidence, must set forth specific facts showing that a genuine issue of material fact exists. *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002); Fed. R. Civ. P. 56(e)(1). The non-moving party does not need to produce "evidence in a form that would be admissible at trial in order to avoid summary judgment"; "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred." *Celotex*, 477 U.S. at 324.

To meet its burden and survive summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

## III.  DISCUSSION

Defendants assert that they are entitled to summary judgment on Plaintiff's claims because they are all entitled to qualified immunity or, in the alternative, because there is no genuine issue of material fact as to whether Plaintiff's Eighth Amendment rights were violated. Plaintiff contends that summary judgment is improper because qualified immunity is not

6

available in these circumstances and because there are numerous issues of fact with respect to his constitutional claims.

Qualified immunity protects "[g]overnment officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, to assess whether a government actor is entitled to qualified immunity, courts apply a two-part test on summary judgment, asking (1) whether the plaintiff has shown a violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the alleged constitutional deprivation. *Pearson v. Callahan*, 129 S. Ct. 808, 815-16, 818 (2009). Because "it was no doubt clearly established long before 2004 . . . that the [E]ighth [A]mendment require[s] prison officials to protect prisoners from violence at the hands of other prisoners," *Young v. Selk*, 508 F.3d 868, 875 (8th Cir. 2007), as Plaintiff alleges Defendants failed to do in this case,[5] the operative question, both in terms of the qualified immunity analysis and Defendants' contention that Plaintiff has failed to present sufficient evidence of a constitutional violation, is whether there are any genuine issues of material fact as to whether Defendants committed the alleged Eighth Amendment violations.[6]

"It is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety"; in order to be liable under the Eighth Amendment, the official must have been deliberately indifferent "to a substantial risk of serious harm to an inmate." *Farmer v. Brennan*, 511 U.S. 825, 834, 828-29

---

[5] It is true that the "clearly established" aspect of the "[q]ualified immunity analysis must be undertaken in light of the specific context of the case, not as a broad general proposition." *Williams v. Jackson*, 600 F.3d 1007, 1013 (8th Cir. 2010). The Court does not believe, however, that it would be helpful to the analysis to frame the issue any more narrowly than as presented above, and in any case, Defendants do not appear to claim that the asserted Eighth Amendment right was not clearly established when the alleged events took place. *See also id.* at 1013-14 (discussing the level of specificity necessary in framing the nature of the alleged constitutional deprivation).

[6] Courts may approach the two prongs of the qualified immunity analysis in either order. *Pearson*, 129 S. Ct. at 818.

(1994). As that statement suggests, a § 1983 claim alleging such a violation requires proof of two elements, one objective and one subjective: (1) an objectively substantial risk of serious harm in the conditions of incarceration, and (2) deliberate indifference on the part of the defendant, measured subjectively and therefore requiring actual knowledge of the risk and a corresponding failure to take reasonable measures to lessen it. *See id.* at 834-36, 847.

The subjective deliberate indifference component, in the context of a failure-to-protect claim, requires "actual intent that the inmate be harmed, or knowledge that harm will result, or reckless disregard of a known excessive risk to inmate health and safety." *Id.* at 652. In the latter case, where the plaintiff alleges that prison officials recklessly disregarded a known risk, deliberate indifference "requires that the official was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and he must also draw the inference." *Norman v. Schuetzle*, 585 F.3d 1097, 1104 (8th Cir. 2009) (internal alterations, quotations, and citation omitted). Negligence as to an inmate's safety does not amount to deliberate indifference. *Id.* (internal citation omitted); *see also Farmer*, 511 U.S. at 835 ("Eighth Amendment liability requires more than ordinary lack of due care for the prisoner's interests or safety.") (internal quotations and citation omitted).

With respect to Defendants Faulkner, McKay, Jackson, and Beck – those Defendants who were on duty the morning of the second alleged assault – Plaintiff concedes that he has been unable to come forward with any evidence that they were aware that Plaintiff was at risk of harm in the general prison population. Plaintiff suggests that his inability to present evidence on this point is due to some inconsistencies in their statements concerning where precisely they were working that morning, but this issue has no relationship whatsoever to their knowledge of the first alleged assault or Plaintiff's temporary placement in administrative segregation. In short, there is no evidence that these Defendants would have had any reason to believe that Plaintiff was in danger from any other inmates, and as such, the Court finds that they are entitled to

qualified immunity on Plaintiff's claims based on the lack of any showing of a constitutional violation.

The remaining Defendants (hereafter, "Defendants") are likewise entitled to summary judgment on this basis. At its core, Plaintiff's claim is that Defendants all knew that he had received non-life-threatening injuries and death threats in a single assault by a group of unidentified inmates, and that their subsequent decision not to keep him indefinitely in protective custody therefore constituted deliberate indifference to his safety. Assuming that Plaintiff did indeed face an objectively substantial risk of serious harm, assuming that all of these Defendants were actually aware of that risk, and assuming that they all actually possessed the authority to transfer Plaintiff into protective custody – all issues about which the Court has, to say the least, substantial questions – there is still no evidence from which a jury could infer that they were reckless in deciding that Plaintiff could be returned to the general population following the first alleged assault against him.

Indeed, the evidence establishes that Defendants took reasonable measures to prevent future harm to Plaintiff and that irrespective of whether the first alleged assault did in fact occur, Defendants concluded that Plaintiff was not entitled to protective custody because they did not actually believe that he was at serious risk of harm in the general population. *See Farmer*, 511 U.S. at 835 (officials are not reckless where they take reasonable measures to lessen harm). In response to Plaintiff's report of the first assault, C. Clinton and other corrections officers locked the wing down and searched for inmates with injuries from a recent altercation or who otherwise fit the description Plaintiff provided, without success. Furthermore, Plaintiff's immediate placement in TASC and then, after he was found guilty of the conduct violation, in administrative segregation for thirty days, had the precise effect Plaintiff desired – that of removing him from the general prison population.

9

The record also demonstrates that Defendants decided that Plaintiff was not entitled to protective custody because they did not actually believe he was at serious risk of harm in the general population – that is, they did not actually draw the inference of a substantial risk. *See Norman*, 585 F.3d at 1104 (officials must actually draw inference of serious risk in order to be reckless with respect to it). The evidence is consistent that the primary reason Plaintiff was denied continued protective custody was because there was no specific, known threat to Plaintiff in the general population; he was unable to identify any specific enemy and Defendants' investigation into the assault did not uncover any suspects. Plaintiff himself acknowledged that it was "beyond strange" that he was unable to determine who had assaulted him or why. As such, the evidence does not indicate that Defendants were anything more than negligent in deciding that the risk to Plaintiff was not as severe as he represented. *See Pagels v. Morrison*, 335 F.3d 736, 740-41 (8th Cir. 2003) (inmate's letter concerning threat to his safety insufficient to establish deliberate indifference where official receiving letter testified that he did not actually believe that risk was serious and that such allegations were common among inmates trying to change cellmates). In sum, the evidence establishes that Defendants took reasonable measures to ascertain the threat to Plaintiff's safety, and having been unable to determine who had assaulted him, or even if he had in fact been assaulted, it was not reckless for them to deny him protective custody.

The Court therefore concludes that Defendants are entitled to summary judgment on Plaintiff's claims on the basis of qualified immunity. Defendants have established that there is no evidence in the record from which a reasonable jury could infer that they were deliberately indifferent to Plaintiff's safety in deciding to return him to the general prison population approximately thirty days after he had allegedly been assaulted by a group of unidentified inmates. There are therefore no genuine issues of material fact as to whether Defendants'

actions violated Plaintiff's Eighth Amendment rights, and qualified immunity bars Plaintiff's claims.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [doc. #162] is **GRANTED**.

Dated this 20th Day of September, 2010.

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE